GASPAR, RESPONDENT, *v.* BUCKINGHAM, ADMINISTRATOR, APPELLANT.

(No. 8493.)

(Submitted May 23, 1944.   Decided June 5, 1944.   Reargued December 11, 1944.   Opinion on Rehearing filed December 14, 1944.)

[153 Pac. (2d) 892.]

*Mr. Floyd O. Small* and *Mr. Paul T. Keller* of Helena for Appellant.

*Mr. Ralph J. Anderson* of Helena for Respondent.

Honorable DAVID N. NYQUIST, District Judge, sitting in place of Mr. Justice ADAIR, disqualified, delivered the opinion of the court.

This is an appeal by Walter E. Buckingham, as administrator of the Estate of William Gaspar, deceased, from an adverse judgment in an action instituted by Teador Gaspar, the general purpose of which action, as set forth in the complaint, is to establish the claim of the said Teador Gaspar that he and his brother, William Gaspar, were partners in the livestock and ranching business, which was conducted by William Gaspar up to the time of his death; and that by reason thereof, Teador Gaspar is now entitled, as a surviving partner, to one-half of all the assets, property and proceeds of such business which the administrator of the William Gaspar Estate now has in his possession.

The plaintiff in the court below, Teador Gaspar, respondent herein, seeks to have himself declared a partner of the deceased brother, William Gaspar, at the time of his death, and as such entitled to the possession as such surviving partner, of what had been previously assumed the property of William Gaspar, and to be declared a half owner of all that property; and for the recovery of a money judgment in the amount of $69,841.44 against the defendant administrator, appellant herein, for funds which the said Teador Gaspar claims he advanced to the Estate, and for moneys belonging to him of which he asserts the administrator is wrongfully in possession.

The defendant, administrator of the William Gaspar Estate, by his answer generally denied that any partnership ever existed between plaintiff and his brother, William Gaspar; alleged that the livestock and ranching business in question was owned and operated solely by William Gaspar; that plaintiff never had and does not now have any right or interest in such business or any of its property or assets as a surviving partner; that the Estate has no money whatever belonging to plaintiff; and generally that plaintiff was not entitled to any judgment or relief whatsoever.

After the trial of the case, the court below made findings of fact and conclusions of law generally in favor of plaintiff and against the defendant, and judgment and decree was accordingly made and entered in favor of plaintiff and against the defendant, from which judgment the defendant has taken this appeal.

From the evidence it appears that William Gaspar and Teador Gaspar, commonly known as Tony Gaspar, came to this country from Roumania, and settled in Meagher County, the latter arriving in the year 1914, and William Gaspar having arrived some seven or eight years before. Both brothers were hard-working and capable stockmen, and each was extraordinarily frugal and saving in his habits. It appears that they had discussed together the possibility of getting into the livestock business, and each brother had saved approximately $12,000

with which to finance this business. Neither brother had married, and there were no other relatives in the United States.

In the year 1933, when we were in the depths of the depression and livestock was low in price, it appears that the brothers thought that a favorable time had arrived for the launching of their enterprise. With the $12,000 that each had saved, they were in a position to take advantage of the very favorable opportunity which presented itself at that time. From all the evidence it clearly appears that the brothers maintained a close relationship, both in personal and business matters. Each had taken out a policy of life insurance, with the other as beneficiary. William, as the older brother, was plainly the leader. He made all the arrangements and conducted all the business which was done. The initial herd of cattle was purchased in his name, and the brand was transferred to him. No land was purchased, but numerous leases on land were taken in the name of William Gaspar. He transacted the business, paying the help, and bought and paid for all supplies which were used in the ranching enterprise, in his own name. Each of the brothers contributed approximately the same amount toward leases and the purchase of the initial herd, and from all that appears in the evidence, the original investment made in cattle and in leases, was all the money that ever went into the enterprise, the livestock being increased from the original herd, or from proceeds of sales made from it. There is no evidence to indicate that any money ever came to William Gaspar from any other source. The only question presented is whether Tony Gaspar's contribution was a loan to his brother, or an investment in the enterprise.

At the time the original herd of cattle was purchased, Tony Gaspar was working for Mr. Walter E. Buckingham, and receiving a salary of $125 per month. He continued on that job for two years, and the money he received as wages went into the ranching operations conducted by William Gaspar. His explanation was that his brother could hire men much cheaper at the time, and that the high wages which he received could be used to better advantage as operating capital than by his going

over to the ranch himself. In view of the conditions existing at that time, this seems to be a reasonable and logical explanation, and he is corroborated by the testimony of witnesses who were so informed by William Gaspar. In 1935 Tony joined his brother, and from that time on he stayed with his brother during his lifetime, with William Gaspar in charge of the operations, and Tony giving his full time to the enterprise.

There is substantial evidence, · independent of the testimony of Tony Gaspar, to show that he occupied a position which was definitely other than that of an ordinary hired hand. He was consulted by his brother on the sale of cattle or sheep, and on various occasions when he would not agree to a sale, the sale would not be made.

It seems that the evidence allows for but one conclusion, and that is that Tony Gaspar had the right, and exercised the right, to have a controlling voice in a very vital part of the operations, that is, the sale and disposal of the property. He had to agree to sales, and he had equal right in the determination of the prices at which livestock should be sold, and the terms under which they would be sold. From the time that Tony Gaspar went on the ranch with his brother until his brother's death, he never was paid any wages or received any money except the money that came from the division of the proceeds of sales of livestock. No evidence was produced showing any payments to Tony, either by way of reimbursement of money put into the enterprise or of wages.

From the facts, there seems nothing to indicate that the money paid was a loan. If so, there was plenty of opportunity to return it, and the method of dividing the proceeds from sales indicated a division of profits rather than the repayment of any definite amount. It seems inconceivable that Tony Gaspar, a man of extremely frugal habits, would give up a position paying him $125 per month, which was considerably above the average wage for livestock hands in the depth of the depression, and without wages or compensation of any kind, give five years of his services to his brother, and in addition, during that time,

contribute some twelve thousand dollars to the business being operated under the direction of his brother, without there being some understanding between them. It is true that the business was operated by the older brother, in many respects, as though he were the owner, but such a situation is not uncommon in a family group, particularly with immigrants from a foreign country. William Gaspar had come to the United States some seven or eight years before his brother, Tony, and was four years older than his brother, so it is not unnatural to believe that Tony reposed the utmost confidence in his brother's methods of doing business, and that Tony would leave the management of the livestock business largely in the hands of his older and more experienced brother. Tony had but little education in Roumania, and none in the United States. He speaks English brokenly and has difficulty in understanding common, ordinary English words.

In his memorandum opinion, the learned Judge in the court below had this to say: "All the witnesses produced by the plaintiff and the defendant, offered testimony which was without any substantial conflict, and it seemed to me that all of the testimony appeared to be honest and unbiased, and impressed me as being truthful, and the honest recollection of the witnesses who testified. The testimony from reputable witnesses established the fact that William Gaspar intended to go into business with his brother, and thereafter they worked together for a common purpose. It established the fact that Tony Gaspar had contributed substantial amounts of money toward the operation of the business. It shows a division of money received from sales. Several witnesses testified to statements made by William Gaspar in his lifetime, from which no inference could be drawn other than that he and Tony were partners, or at least, that Tony had an interest in the business."

All the evidence supports Tony Gaspar's positive statement that a partnership did in fact exist. It is true that he applied for letters of administration of his brother's estate, in spite of the statute prohibiting a partner from being appointed

as administrator. He was advised by the District Judge that this could be done, as evidenced by a letter offered in evidence. Tony said that he showed this letter to Mr. Linn, the attorney who filed his petition for letters of administration. Later, he put in a claim against the Estate for the value of his wages during the time that he worked for his brother, and in addition, according to the claim filed, asked for payment of certain notes which he states were given him by his brother as evidence of his contribution to the partnership capital. His testimony is to the effect that this claim was filed upon the advice of counsel, and that he would not have done it except for such advice. He states that his attorney told him that the time for filing claims against the Estate would shortly expire, and that if he did not present his claim, he would not receive anything from the Estate for his services or for the money that he had put into the business if he failed to establish his rights as a partner. His attorney had asked for his appointment as administrator, over his statement that he was a partner in the business. In view of the letter written by the District Judge, it can hardly be questioned that Tony, from the beginning, insisted that he was a partner.

In view of the decision of this court in the case of *Rowe* v. *Eggum*, 107 Mont. 378, 87 Pac. (2d) 189, 194, we do not think that this was an election of remedies which was binding upon Tony Gaspar. This court there said: ''Defendants also contend that the existence of an agreement as claimed by the plaintiff is refuted by the fact that a claim was first presented to the executor and rejected, and an action filed for the purpose of establishing the claim which was later dismissed. The circumstances under which this procedure was followed was explained, as found by the trial judge, and that explanation the court properly found was satisfactory and did not bar plaintiff from maintaining this action. Similar facts were involved in the case of *Popejoy* v. *Boynton*, 112 Or. 646, 229 Pac. 370, where the court, in holding that the presentation of a claim which was rejected did not bar action on the agreement, said * * *: 'The only serious attack made upon this suit of plaintiff's is the

fact that she presented a large bill to the probate court for all of these services, which appears to have been rejected; but she explains this by saying that her then attorney advised her that this was the only way in which she could get what she was entitled to, and we are disposed to accept that as the true explanation.' The course pursued by plaintiff under the circumstances. did not constitute an election of remedies. It was an apparent election made under mistake as to his rights, which the courts hold is not binding upon him. (20 C. J. 37; *Kaufman* v. *Cooper*, 39 Mont. 146, 101 Pac. 969).''

The advice of his counsel was good under the circumstances, because he otherwise stood to lose the fruits of his labor and savings in event he was not able to establish his partnership claim. Undoubtedly, the claimant could have advised the court of his contention, and could have reserved his right to claim that he was a partner, but in view of the decision in the *Rowe Case,* supra, we do not believe that he was bound by such a claim, or that his position in this proceeding had been materially changed. The position taken by this court in the *Rowe Case* follows the rule adopted in the earlier cases of *Kaufman* v. *Cooper,* 39 Mont. 146, 101 Pac. 969, and *O'Meara* v. *McDermott,* 43 Mont. 189, 115 Pac. 912.

Upon the death of his brother, Tony Gaspar took charge of ▇ the property which was included in the operations theretofore conducted under the management of William Gaspar, and paid the operating expenses from his own funds. He had had possession of the property at all times, either as an individual or administrator, except when it was taken from his possession by order of court. The fact that Tony would only part with the property under pressure strongly indicated his belief that he was entitled to possession. It is our opinion that any failure to retain possession of partnership property under such circumstances could not estop him from claiming a right of possession for purposes of this action.

The money which was deposited by him in the Butte bank, and the other deposits which were made in his own name, were

turned over to his successor as administrator, not as a voluntary act, but because he believed that he was required to do so, and because he was ordered to do so by those in a position of authority, which he felt he was obliged to respect.

The fact that a claim has been allowed against the Estate does not finally establish his right to receive payment of that claim. It may be contested upon the settlement of the final account, and there were statements made at the time of the trial which strongly indicate that it is a matter which is not finally disposed of. Naturally, the court's decision in this matter, sustaining Tony's contention that he was a partner, avoids the payment of such claim.

It would be a harsh rule which would permit the brother to ▆ pay the operating expenses for the preservation of estate property without permitting him reimbursement for the care of the property owned by the estate. It is true that Tony has filed no claim against the estate for that particular purpose, but since this is a claim which did not originate during the lifetime of William Gaspar, there is nothing in the law which requires him to file a claim such as would be necessary for a creditor of the estate, in a claim based upon a liability which existed during the lifetime of the decedent. Such is the rule laid down by this court in the case of *Nathan* v. *Freeman*, 70 Mont. 259, 225 Pac. 1015, 41 A. L. R. 138.

The editor of American Jurisprudence (40 Am. Jur. 145), in discussing tests or indicia of partnership, states that the courts have encountered great difficulty in laying down tests by which to determine the existence or non-existence of a partnership relation, and comments upon the fact that while the reports are replete with cases applying different tests and indicia to partnership relations, that different conclusions have been reached even upon identical facts, with the result that the decisions are so conflicting on the subject that it is impossible to reconcile them. The editor states that no one fact or circumstance can be taken as a conclusive test, and that, indeed, it is not possible to state any number of facts that would, in all cases,

be decisive of the existence of a partnership relation. In the last analysis, the editor says, the facts and circumstances of the individual case must control.

It is difficult, at times, to determine the true status of parties who are working together. The facts of particular cases as developed by the evidence, frequently leave the mind in doubt as to whether the relationship of the parties was that of partners or master and servant.

In reviewing the authorities, it seems to this court that the case of *Constanti* v. *Barovic*, 199 Wash. 117, 90 Pac. (2d) 724, 728, summarizes the rule which is applicable to the present action. Thus the Washington court says: "In *Nicholson* v. *Kilbury*, supra, this court stated (83 Wash. 196, 145 Pac. [189], 191): 'There is no arbitrary rule by which it may be determined whether a partnership relation existed in a given instance or not. The existence of a partnership depends upon the intention of the parties. That intention must be ascertained from all of the facts and circumstances and the actions and conduct of the parties. While a contract of partnership, either expressed or implied, is essential to the creation of the partnership relation, it is not necessary that the contract be established by direct evidence. The existence of the partnership may be implied from circumstances, and this is especially true where, as here, the evidence touching the inception of the business and the conduct of the parties throughout its operation, not only tends to show a joint or common venture, but is in the main inconsistent with any other theory. (*Bridgman* v. *Winsness*, 34 Utah 383, 98 Pac. 186.) It is well settled that no one fact or circumstance will be taken as the conclusive test. Where, from all the competent evidence, it appears that the parties have entered into a business relation combining their property, labor, skill, and experience, or some of these elements on the one side and some on the other, for the purpose of joint profits, a partnership will be deemed established.' "

The rule stated is in full accord with that laid down in the case of *Simons* v. *Northern Pacific Railway Company*, 94 Mont.

355, 22 Pac. (2d) 609, 614, wherein this court said: ''The question of such existence is one of fact, to be answered by an examination of the relationship subsisting between the parties. If the facts bring the arrangement within the definition of a partnership, the parties cannot escape liability incident to that relationship merely by saying that no such thing exists. The question of what constitutes a partnership is one of law, to be determined by the court, and, of course communicated to the jury by appropriate instructions. The Law of Partnership by Strahan & Oldham (5th Ed.) 26; Mechem's Elements of Partnership (2d Ed.) 58. * * * A partnership agreement need not be in writing and it may be expressed or implied. It is only on the creation of a special partnership that the law requires the formalities suggested by the testimony of Dr. Jennings. (See sections 8027-8032, Rev. Codes 1921.) Every general partner is the agent of the partnership in the transaction of its business. (Section 7997, Id.) * * * To establish the existence of a partnership it is not necessary that its elements be proved by direct evidence (*Silver* v. *Eakins*, 55 Mont. 210, 175 Pac. 876), and a billhead purporting to show the names of the partners is competent evidence on this question. (*Knight* v. *Richter*, 11 Mont. 74, 27 Pac. 392).''

The editor of California Jurisprudence makes this pertinent observation: ''But if the essentials of a partnership,—that is, carrying on business together and sharing profits and losses,—are present, the fact that the agreement is characterized by various circumstances usually associated with the relation of employer and employee does not destroy the partnership relation.'' (20 Cal. Jur. 701.)

Viewed in the light of the foregoing decisions, it is apparent that the evidence discloses very clearly the existence of a partnership between the two brothers, William and Tony Gaspar. Neither brother received anything for his services in the nature of a salary. Both worked together, William looking after the business, the leasing of lands, and the payment of the bills, and Tony devoting his entire time and attention, after 1935, to

caring for the livestock and providing hay for feed. Clearly, William had declared his intention to form a partnership with his brother to engage in the livestock business. There can be no question about the contribution of capital by the plaintiff to the partnership enterprise; and while there seems to be some question as to the amount contributed by the brother, William, there can be no question about the fact that he contributed approximately the same amount as the brother, Tony. The presumption was and is, in the absence of any showing to the contrary, that the contributions were equal; and, until this presumption is overcome, the partners are to share equally. The testimony of plaintiff was that the partners were to share all the property equally. Neither can there be any question about the contribution of services by the plaintiff to the enterprise without any compensation, and that there was a division of profits between the two brothers from the sale of livestock. There was also active participation in the management and policy of the enterprise by the plaintiff, which the evidence discloses particularly in the matter of sales.

On rehearing defendant argued strenuously that the allegations of the complaint were insufficient to state a cause of action because it was not stated that an accounting was made or that a claim was presented to the administrator as provided by the probate code. For this proposition defendant relies upon *Mares* v. *Mares,* 60 Mont. 36, 199 Pac. 267, and *Myers* v. *Sumer,* 64 Mont. 342, 210 Pac. 76.

Section 10261, Revised Codes, provides that upon the death of a member of a partnership the surviving partner has the right to continue in possession of the partnership, settle its affairs without delay, account with the executor or administrator, and pay over any balances from time to time due the decedent's estate. Only the decedent's interest in the partnership is to be included in the inventory and appraisement of the estate.

In *Mares* v. *Mares,* supra, the surviving partner had not settled the partnership affairs, nor given the accounting required by him by section 10261, supra (then sec. 7607, Rev. Codes 1907),

but sued the executrix of the deceased partner, claiming that the latter was indebted to him over and above the partnership assets for cash advanced to the partnership in excess of that advanced by deceased, and for money drawn by deceased in excess of his share of the profits and partly used for the purchase of real and personal property in the name of deceased. The prayer was for an accounting; that said real estate and personal property purchased with partnership funds be declared partnership assets; that all assets be sold and the proceeds applied toward the sum found due plaintiff on an accounting; that plaintiff have judgment against the executrix for any balance found due, and that it be paid out of any individual property of deceased in the executrix' hands.

In that case this court noted that plaintiff's demand was for recovery of money alleged due from deceased before his death and must involve an accounting going back over nearly twenty-five years; it noted also that no claim had been presented and that under section 7607 (now sec. 10261) it was plaintiff, not the executrix, who was obligated to furnish the accounting. The court held, therefore, that no cause of action was stated.

The present case is clearly distinguishable in that it involves, not the partnership operation prior to the death of William Gaspar, nor money claimed due from him at his death, to which the claim statute refers (*Dodson* v. *Nevitt,* 5 Mont. 518, 6 Pac. 358; *First National Bank* v. *Collins,* 17 Mont. 433, 43 Pac. 499, 52 Am. St. Rep. 695), but transactions after his death by his administrator, who under probate court guidance had contrary to section 10261 taken over and assumed to administer the partnership property and also a $16,943 bank account allegedly belonging to plaintiff personally. Clearly those actions by the administrator subsequent to the partner's death were not within the claim statute; nor was defendant's management of partnership property a matter within plaintiff's knowledge and of which he could be expected to account. On the contrary, they were the acts of defendant and peculiarly within his knowledge.

Manifestly *Mares* v. *Mares* is not in point; and the same is true as to the case of *Myers* v. *Sumer*, supra.

We have examined carefully all other contentions made by appellant, and find them each and all to be without merit.

It is therefore the opinion of this court that a partnership did exist between the brothers, William and Tony Gaspar, and the decision of the lower court is affirmed in this respect. The decision of the lower court is also affirmed in all other respects, except as to the amount of the money judgment. It appears from the complaint of plaintiff, and from the statement of his counsel at the time of the trial, that the total amount asked for was $69,841.44. The court below awarded a total money judgment of $75,954.64, which is in excess of the $69,841.44 asked for in the complaint. It is therefore the judgment of this court that the money judgment awarded by the district court be reduced from the sum of $75,954.64 to the sum of $69,841.44, and that, as thus modified, the judgment be affirmed.

In view of the circumstances herein, it is further ordered that each party pay his own costs on this appeal.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ERICKSON, ANDERSON and MORRIS concur.