In re McANELLY'S ESTATE.
STATE, Appellant, *v.* GRIESINGER, Respondent.
No. 9159.
Submitted January 5, 1953.  Decided June 1, 1953.
Rehearing Denied July 16, 1953.
258 Pac. (2d) 741.

159

Mr. Arnold H. Olsen, Atty. Gen., Mr. Charles V. Huppe, Asst. Atty. Gen., Mr. H. O. Vralsted, Sp. Asst. Atty. Gen. and Mr. Daniel J. Sullivan, Sp. Asst. Atty. Gen., for appellant.

Mr. Vernon S. Lewis, Fort Benton, for respondent.

Mr. Vralsted, Mr. Sullivan and Mr. Lewis argued orally.

MR. JUSTICE FREEBOURN:

This is an appeal by the State of Montana from an order of the district court of Chouteau County, the Hon. C. F. Holt, district judge, presiding, determining inheritance taxes.

Moses F. McAnelly, also known as M. F. McAnelly, a resident of Montana, died, testate, on October 25, 1947. On May 14, 1951, the state board of equalization of the State of Montana filed written objections to the inventory and appraisement and to the 3-A report of Pearl Griesinger, the executrix of the estate of Moses F. McAnelly, deceased, and petitioned the said district court to have the inheritance tax determined.

In such objections and petition the board alleged: (1) That Moses F. McAnelly was the record owner of 5,506 acres of farmland having a clear market value of $110,150, which the estate has not returned for inheritance tax purposes, and which should be reported for such purposes at said value; (2) that the deceased was the record owner of 120 cows, 110 calves, 3 bulls and

certain hogs of a clear market value of $30,640.55, and that the estate has returned a valuation thereon of only $8,974.16 for inheritance tax purposes; (3) that the deceased was the owner of a joint bank account in his name and that of Pearl Griesinger, executrix and heir in said estate, in the sum of $68,282.01, which account was created on November 25, 1944, less than three years before the death of deceased, and that such bank account should be included in its entirety for inheritance tax purposes, while, in fact, only $13,493.08 of such amount has been so included; (4) that the deceased was the owner of six United States savings bonds, having a face value of $5,000 each, with a taxable value at the date of death of $3,750 for each bond, making a total value subject to tax of $22,350, which total should be included for tax purposes, while the estate had not returned such amount for tax purposes; (5) that deceased was the record owner of certain farm machinery having a clear market value of $17,560 for tax purposes, while the estate has returned only $3,367.67 thereof; (6) that the board objects to the 3-A or final report and that part thereof whereby the estate seeks as a deduction the sum of $47,686.74 paid as federal estate tax, for the reason that the estate tax as found by and paid to the internal revenue department of the United States was $44,339.42, and that the difference between these two amounts, or $3,347.32, is the interest due to the United States Government which the estate had allowed to accumulate on the tax of $44,339.42, and that such interest is not deductible.

The district court was asked to find the gross estate of the deceased to be $280,094.86 and the total deductions for inheritance tax purposes to be $60,568.98.

The third amended final, 3-A report of the executrix had reported and the trial court found the gross estate to be $95,084.71 and the allowable deductions to be $63,916.30.

The testimony of George Campbell, real estate and farm implement dealer of Big Sandy, and a Montana resident for fifty years, tended to show the existence of a joint adventure by the McAnelly family since the year 1919. According to Campbell, he

closed a trade in 1919 between M. F. McAnelly and the Griesingers on the one hand, and a Mr. Van Alstine, of Chouteau County, on the other, whereby real and personal property in Idaho went to Van Alstine and real and personal property in Chouteau County went to McAnelly. Of the Idaho property, "Fred Griesinger and wife owned 287 acres on the river * * * which was turned in on this trade * * * and the 260 acre tracts west of these belonged to McAnelly. * * * they made a trade. There was * * * cattle that McAnelly owned * * * work and saddle horses * * * and the machinery * * *" Van Alstine turned over "1200 acres of land and * * * some cattle" to McAnelly. Van Alstine took the Idaho land subject to encumbrance, "and the McAnelly family took the Chouteau County land" subject to an encumbrance.

The McAnelly family consisted of "Pearl Griesinger, who is a daughter of M. F. McAnelly, and Fred Griesinger, and then there was Alice McAnelly [now Quinn] an unmarried daughter at that time * * * Frank Maxwell, a grandson [of] * * * and Mr. and Mrs. McAnelly."

Mr. and Mrs. McAnelly and Frank Maxwell came to Montana in 1919, and the Griesingers came the next year, bringing with them "a car load * * * some cattle in it and livestock * * * machinery and equipment and household goods * * * which was turned into the farm operations here in Chouteau County."

Campbell had many business discussions with McAnelly. He "sold him a lot of machinery, too. * * * I had quite a lot of business with M. F. McAnelly. * * * the farming operations were handled as a family partnership or joint adventure. * * * Mr. McAnelly always did the business, but it was thoroughly understood that it was a three-way ownership there. Griesinger and McAnelly and the grandson all had their separate duties. At that time Griesinger looked after the cattle and ran the horses on the farm machinery. Maxwell ran the power machinery, and they all worked together. There wasn't any question about that. * * * It was a partnership deal."

Campbell had discussed with McAnelly the fact that the title

to the land was in McAnelly's name, and testified: "It was for a credit standing, for one thing, that he kept it in his name. They had a lot of hard luck when they first came there. They hit the driest years we had for many years. They had to sell off all the cattle they had * * * Mr. McAnelly said he had to keep this all under one management in order to keep his credit and he had bought—they bought a lot of land * * * on payments * * * it came out of this ranch."

Up until McAnelly's death on October 25, 1947, McAnelly, the Griesingers and Maxwell worked together as a unit in handling the ranch. "It was generally understood by everybody. The neighbors knew it and everybody else around there knew it." That it was a family venture and the children owned respective shares. When machinery was bought they were all consulted.

As far as profit and loss were concerned, "everything went back into the outfit for years to keep it running. * * * I know that they always said it was a partnership * * * Mr. McAnelly most always did the business. * * * they were using machinery out there that we sold them, and it was sold to the outfit, and Frank was using that. In fact, he ran most of the power machinery * * * He lived right there on the same land, and so did the Griesingers. They all lived around the same clump of buildings until Frank finally built back up on the hill, bought a place."

Paul Green, who threshed for the McAnelly family "in the fall of 1920" said the farming operation was "always—in my opinion, it was a family venture. Frank Maxwell, the grandson, looked after the machinery and Fred the livestock, and it was my opinion that Mr. McAnelly done most of the legal work. * * * It was the general opinion of everybody I ever talked to that it was a family affair. * * * in the fall of 1920 when I was threshing for them * * * Mr. McAnelly and his wife one evening after supper * * * were talking about the place * * * he told me that his son-in-law, Fred, and his daughter Pearl were coming out and bringing their car and stuff and take over the farming. * * * Everybody considered that it was a family venture that I

ever talked to. * * * The Griesingers and Maxwell and Mr. Mc-Anelly'' all had an interest in it. Frank Maxwell and Fred Griesinger ''worked all the time.'' Frank ''in the later years did some farming himself, but up until Mr. McAnelly's death he was always working around the ranch. He looked after the machinery pretty near entirely, and Fred the stock.''

Mrs. Bessie Green, who lived near Big Sandy since 1910, her place being about five miles from the McAnelly place, knew the McAnelly family ''quite well. * * * I have visited them since the summer of 1920. * * * My understanding is, and it is a matter of common knowledge in the community, that their farm and ranch was conducted as a family partnership.''

Fred Griesinger, son-in-law of Mr. M. F. McAnelly since 1911, when he married Pearl McAnelly, testified that he had lived on the ranch near Big Sandy since 1920, coming there when he was 32 years of age. In 1912 he had 287 acres of land in the Kootenai Valley of Idaho, which adjoined McAnelly's land, and which McAnelly leased and held ''until we made the trade with Van Alstine. * * * Mr. McAnelly and I traded in land in Idaho for the Van Alstine land in Chouteau County. * * * I had $3,175.00 paid on it at the time we made the trade.'' He had 200 acres in Boundary County, Idaho ''and 287 acres additional on that'' which was all turned in on the trade. He deeded to McAnelly and McAnelly deeded to Van Alstine.

The plan was, according to Griesinger, that when the trade was made, after his affairs in Washington were cleaned up, to come to Montana and become a part of the family venture in farming. Property ''I sold—it amounted to $3,174.34 * * * was all put into our venture in Montana. * * * that was our own funds.'' The value of the land turned over by the Griesingers in the Van Alstine trade, less the encumbrance, was approximately ''four thousand dollars * * * I sent pa four hundred dollars to apply on our taxes and interest we had to pay. * * * I assumed my part of it, yes my half of it'' of a balance due the State of Montana, on the Montana land, and also a mortgage on it of $3,500 due a St. Paul firm. In the fall of 1920, ''I got a big

immigrant car and I put in my cattle, horses and hogs and house-hold good and machinery, everything I could get into it, and what I couldn't get in I sold in the sale." As to the value of the stock and equipment which was in the immigrant car and which went into the joint adventure he said, "Well, a conservative estimate would be $2500.00. * * * I had $860 for working capital at the time I moved to Montana. This also went into the farm and ranch as part of the running expenses." His 1920 Ford was used in general operation of the ranch.

The cattle Griesinger brought and the one cow McAnelly had, in 1920, "was our starting point. * * * We saved our heifer calves as the years rolled by, we never sold our heifer calves, and just kept increasing the herd. * * * it was kind of a family affair, and as the years rolled by the herd got larger and larger," and they could not brand separately without a great difficulty and "I had to give that part of it up. I voluntarily used pa's brand," Mr. McAnelly's.

Up to 1935, when the livestock was sold, each received a share of the proceeds. About 1935 "we changed to three-eighths to my wife and I, and three-eighths to Mr. McAnelly and two-eighths to Frank Maxwell." That was the share of each of the respective parties up until McAnelly's death.

In 1923, "I had a chance to rent what is known as the Carpenter place * * * from McKenzie & McKenzie of Great Falls. That is part of the holdings now. * * * Mr. McAnelly bought the property. He was doing the business part of it, with my consent. * * * I farmed that for four years" and what he got out of it "all went for operating expenses. * * * McKenzie got right close to $4,000.00 in the four years for his share * * * one-fourth delivered * * * three times that, if we could have got it all in cash, * * * was all used in the one operation."

For his share of the joint farming adventure, "we got our living expenses * * * and around seventy-five hundred * * * that would be in bonds." He and his wife, Pearl, received three groups of bonds of the face value of $5,000 each. The money that went into these bonds "came out of the general proceeds

* * * of the earnings'' after the year 1943. When he first came to Montana, ''we was supposed to be fifty-fifty on our farm operations'' under a verbal partnership agreement. Frank Maxwell was not included then; he came in later. The bonds ''absolutely'' came from the proceeds of the lands.

Frank Maxwell, McAnelly's grandson, knew the Griesingers turned in the land on the Van Alstine trade. They turned in what ''they call the Shively place * * * in Idaho'' for which they received no compensation at the time. They also turned into the partnership what came in the immigrant car, ''that was taken right to the ranch.'' He contributed his services to the venture and ''all I got was my bare living expenses, is all I figured on. * * * it looked to me'' that Mr. and Mrs. Griesinger got the same.

In the early years of the ranching venture each of them owned cattle separately but, ''after it got to be quite a few head it got to be quite a job to keep them separate so we just let them all go in one bunch and under one brand * * * after we put them in one bunch we figured three-eighths to the Griesingers, three-eighths to Mr. McAnelly and two-eighths to myself.''

It was about 1943 ''before there was anything left over. Most of the money went to pay for the land, pay for running expenses and machinery. * * * it took pretty near everything there was. There wasn't any surplus left at that time. * * * All the land that was bought under the folks there was bought under contract,'' and paid for as money was earned out of the joint adventure.

''My line'' of serving the venture was handling the farm machinery. Mr. Griesinger ''took care of the livestock mostly.'' They worked as a family unit, sharing in what was made and put back in the lands and equipment. He ''owned one-third'' of the farm machinery and ''the Griesingers and the McAnelly'' each owned a third.

In 1945 or 1946 he received three groups of $5,000, face value, bonds. ''They were my bonds.'' Mr. and Mrs. Griesinger and Alice Quinn ''got practically the same amount.'' Those bonds

were theirs. They came from their share of the earnings from the land.

In 1943 the land was divided by McAnelly deeding to them. The earning capacity of each of the three tracts was about the same.

All family papers were first "kept in the drawer there and then later on, when they began to get a little more numerous * * * we purchased a steel box and put them all in that. * * * I had some of my own personal papers, as well as these others that was in there. That was kept in the house. * * * I put my stuff in there the same as the rest of them * * * abstracts, deeds, * * * my personal stuff. The bonds and deeds were kept in this box, which he had access to. The bonds with his and McAnelly's name on were his bonds." McAnelly had no interest in these bonds other than, "it was understood it was listed in his name, the bank put it on there." These bonds were always considered his and he had control over them.

Prior to 1942 or 1943 no profits were divided. "Most all the money that was made went for the payment of this land * * * that was what it was held together for, for that purpose, borrowing so we could run it. * * * We talked about that lots of times, keeping it in one name just so we could get some credit if we needed it. We needed it. * * *" The property was in McAnelly's name with his and Griesinger's consent. He had an interest in the property all the time.

He, Mrs. Quinn, the Griesingers and McAnelly had each a one-fourth interest in the grain. "When new machinery began to come on the place it was divided three ways. * * * I had one-third, Fred had one-third and Mr. McAnelly had a third * * * from the first new machinery that was bought." The agreement to share in the profits "was verbal."

The testimony of Pearl Griesinger showed that she was the daughter of M. F. McAnelly and the wife of Fred Griesinger. Her testimony corroborated much of the testimony of Fred Griesinger and Frank Maxwell. She said the bank account was in her father's name but was considered a family account. She

had a right to issue checks on this account, as agent of her father, over a long period of years. She never signed a check, using only her name, until the joint bank account was established. Two checks, in evidence, dated August 15, 1936, were signed, "M. F. McAnelly, By Pearl Griesinger." According to her, earnings from the joint adventure were deposited in the family account in Mr. McAnelly's name. This account was closed and the money therein went into the joint account, which stood in the names of M. F. McAnelly and Pearl Griesinger. This joint account had $68,282.01 in it at the time of McAnelly's death. This account, she said, contained her and her husband's share of the earnings of the farm venture over a long period of years. It also contained the entire earnings for 1947 of the whole joint adventure.

She said they relied upon income tax returns to determine how much of this joint account belonged to each member of the family. From 1935 to 1939 they received no cash. Everything went into the family account as working capital. So she figured the fair share of herself and husband for 1935 to 1937 would be $200 a month; and for the years 1938 and 1939, $250 a month. She claimed this amount of the joint account as hers and her husband's. She felt a fair share of the crops after the deeds were executed in 1943 would be "well, we thought that would be a fair estimate of it, a fourth * * * one-fourth to Frank and one-fourth to Mrs. Quinn," and one-fourth to her father. The title to the lands was left in McAnelly's name because, "the place wasn't clear. We didn't have the debts paid and we had to clear the title before we made the deeds out." Money, borrowed from the Federal Land Bank in 1933, was not paid off until 1942; all the encumbrances were not paid off until 1942 or 1943.

The papers of all members of the family were kept first in the library table drawer; then in a steel box, kept in the house, to which all members of the family had access. All the bonds, "in the amount of $7500.00 each in actual value," purchased with joint earnings, and belonging to different members of the family, were in this box. McAnelly had bonds in only his name in

the box and these were listed as his in the inventory. Later the box was taken to the bank and placed in a safety deposit box to which all members of the family had access. Any member of the family could go "to the bank and take what he wanted out of the box." She said the $7500 in bonds was a "fair" share for them of the earnings from the grain.

The deeds giving each of them certain lands were executed on December 1, 1943, and turned over to them and put in the box, from which they could have been taken and recorded at any time, "if we would have wanted to." The property described in the Griesinger deeds was their share in the joint adventure, which was true of the deeds to Frank Maxwell and Alice Quinn. She and Fred owned a third interest in the farm machinery "and so did Frank."

The evidence warrants the finding by the trial court that a joint adventure existed between M. F. McAnelly, Fred Griesinger, Pearl Greisinger, Alice Quinn, and Frank Maxwell for the purpose of conducting farming and livestock operations in Chouteau County.

A joint adventure has been defined to be a special combination of persons undertaking jointly some specific adventure for profit, without any actual partnership or corporate designation; an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. 48 A. L. R. 1056; 48 C. J. S., Joint Adventures, sec. 1, pages 801, 802. See also, Rae v. Cameron, 112 Mont. 159, 114 Pac. (2d) 1060. The courts have not laid down any very certain, satisfactory, or all-inclusive definition of a joint adventure, being content, in most cases, to determine whether the given or conceded facts in the particular cases constitute a joint adventure. 138 A. L. R. 970.

The law requires little formality in the creation of a joint adventure, and in considering whether or not such a relationship has been created, the courts are guided not only by the spoken or written words of the parties, but also by their acts; and where from the facts there is no question but that the parties

intended to go into the deal together so that each might derive profits therefrom, the fact that there is no definite agreement does not prevent the parties from having assumed the relationship of joint adventures. 138 A. L. R. 969. And the rule seems well settled that where the existence of the relationship of joint adventurers is in issue, and there is substantial evidence tending to prove that the parties intended to join their efforts in furtherance of the enterprise for their joint profit, the question is pre-eminently one of fact. 138 A. L. R. 969.

The fact that M. F. McAnelly appeared to control the joint adventure and to be the owner of the lands thereof, when he in fact was not such owner, did not change the status of the enterprise as a joint adventure.

For it is generally held that one joint adventurer may be entrusted with the actual control of the enterprise without changing its status as a joint adventure. 48 C. J. S., Joint Adventures, sec. 2, page 811. See also, Gaspar v. Buckingham, 116 Mont. 236, 153 Pac. (2d) 892.

The evidence justifies the conclusion that the real property, described in the deeds, from McAnelly to the Griesingers, Quinn and Maxwell, and the bonds in the joint names of Mc-Anelly and the Griesingers, Quinn and Maxwell, came from the earnings of the joint adventure, and are the individual property of the Griesingers, Quinn and Maxwell, as their names appear thereon, and such real property and bonds are not part of the McAnelly estate and, therefore, not subject to inheritance tax.

On November 25, 1944, the money in M. F. McAnelly's bank account went into a joint bank account in the names of Pearl Griesinger and M. F. McAnelly. At the time of McAnelly's death the joint bank account balance was $68,282.01. Pearl Griesinger does not claim this money for herself, either by right of survivorship or by virtue of having deposited her own money in such joint account. The claim made is that the $68,282.01 is in fact the money of the joint adventurers which should be divided in such proportions as to leave only $13,493.08 as M. F. McAnelly's share and subject to inheritance tax.

In determining how much each member of the family, as a joint adventurer, should have as his or her share of the $68,-282.01, resort was had to estimation, which resulted in a self-serving written summary of such estimations, which went into evidence by stipulation of the parties, the truth of which the state did not admit.

Pearl Griesinger, whose testimony alone tends to explain the joint bank account, said income tax returns were also relied upon in making up the summary.

The summary, showing receipts and expenses of the ranch and farming adventure, lists the amount paid for labor each year as follows: 1940, $500; 1941, $500; 1942, $500; 1943, $600; 1944, $600; 1945, $600; 1946, $650, and 1947, $700, totaling, over the specified years, $4,650 as labor expense.

However, the income tax returns of McAnelly for the same years tell an entirely different story. The amount paid for labor, in each of the above years, as shown by McAnelly's income tax returns, is as follows: 1940, $3,225; 1941, $3,447.75; 1942, $3,504; 1943, $4,967.09; 1944, $4,567.06; 1945, $4,618.70; 1946, $5,227.10, and 1947, $5,318.27, totaling, over the specified years as labor expenses, $34,873.97.

Since the members of the joint adventure, according to the evidence, performed the labor of the farm and ranch venture, the Griesingers apparently doing the greater part thereof, the only reasonable conclusion that can be drawn from the income tax returns of McAnelly for the years 1940-1947, is that the members of the joint adventure received from the earnings of the venture for the enumerated years not $4,650 as estimated in the written summary, but $34,873.97, as shown by such returns.

The failure of the summary of estimations and the testimony of the witnesses, which conflict with the income tax returns of McAnelly, to show the true facts, make such estimation and testimony wholly unsatisfactory evidence upon which to deprive the state of claimed inheritance tax.

McAnelly, by deed, gave each of the other members of the joint adventure their share of the lands, and in the form of bonds

gave each member, as Pearl Griesinger put it, a "fair" share for them of the earnings from the grain.

By codicil to his will, dated November 26, 1945, he stated that "one-fourth of all wheat and grain on my farm belongs to Fred Gresinger and Pearl Griesinger * * * three-eighths of all cattle on my farm belongs to me * * * one-fourth of all hogs on my farm belongs to Fred Griesinger and Pearl Griesinger." Yet, neither by codicil, nor otherwise, did he give any indication except by the forming of the joint bank account, that any member of the joint adventure other than himself, had or was entitled to share in the $68,282.01.

No evidence was introduced showing any statement made by McAnelly concerning the money in the joint bank account, or what his purpose was in creating it, and no bank official or employee testified relative to the same.

"The best evidence of the decedent's state of mind at the time and his reasons for making the transfers are the statements and expressions of the decedent himself * * *. If the existence of an independent purpose desirable of achievement by the donor is not satisfactorily shown, the gift is presumed to have been testamentary in character and therefore taxable." In re Wadsworth's Estate, 92 Mont. 135, 11 Pac. (2d) 788, 791.

Under the circumstances of this case, and since the law, R. C. M. 1947, sec. 91-4405, considers money held in a joint account in the nature of a gift between the deceased and the survivor of one-half thereof, except as to that part originally belonging to the survivor and never belonging to the decedent; and since the law, R. C. M. 1947, sec. 91-4402, considers the gift made here as made in contemplation of death because made within three years prior to the death of McAnelly, the entire amount of $68,282.01 should be subject to inheritance tax. State Board of Equalization v. Cole, 122 Mont. 9, 195 Pac. (2d) 989. See also, In re Kuhr's Estate, 123 Mont. 593, 220 Pac. (2d) 83.

R. C. M. 1947, sec. 91-4407, which specifies the deductions which are allowed in imposing an inheritance tax upon

172

property passing by transfer, states: "* * * the following deductions, *and no other* shall be allowed; debts * * * expenses * * * all state, county and municipal taxes * * * and federal estate taxes due or paid." The statute is clear and direct and declares no deduction shall be allowed, excepting those specified therein. It does not say that interest paid on federal tax is deductible. Until the legislature sees fit to amend the law and makes such interest deductible, we shall have to hold that the statute means just what it says, and that the amount of $3,347.32 paid the federal government as interest on federal estate taxes is not an allowable deduction for inheritance tax purposes.

For the reasons stated the cause is remanded to the lower court with directions to subject the entire joint bank account of $68,-282.01 to inheritance tax, and to disallow as a deduction the amount of $3,347.32 paid the United States Government as interest on federal estate taxes. In all other respects the judgment is affirmed.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES BOTTOMLY, ANGSTMAN and ANDERSON, concur.